**UNITED STATES of America,**

v.

**Darius JOHNSON, Defendant.**

**No. CRIM.03–422(PLF).**

United States District Court, District of Columbia.

July 29, 2004.

Lionel Andre, United States Attorney's Office, Washington, DC, for Plaintiff.

William Jackson Garber, Washington, DC, for Defendant.

*OPINION*

PAUL L. FRIEDMAN, District Judge.

This matter is before the Court on the defendant's motion to suppress all evidence derived from the August 11, 2003 execution of a search warrant. At a hearing on February 3, 2004, the Court issued oral findings of fact and conclusions of law, holding that the affidavit submitted in support of the search warrant was insufficient to establish probable cause.[1] It reserved ruling on whether one of the exceptions to the "good faith" exception to the warrant requirement articulated in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), operates to save the search and its fruits. The Court concluded that only one of the four exceptions possibly could apply and directed the parties to submit authority on the issue of whether the officers failed to "manifest objective good faith in relying on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Id.* at 923, 104 S.Ct. 3405 (quoting *Brown v. Illinois,* 422 U.S. 590, 610–11, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (Powell, J., concurring in part)). Upon consideration of the parties' arguments, the Court now grants the defendant's motion to suppress.

## I. FACTUAL BACKGROUND

### A. The Affidavit

On August 6, 2003, Officer Claude Jackson of the Metropolitan Police Department completed an affidavit in support of a search warrant for 522 F Street, N.E., Washington, D.C. *See* Transcript of February 3, 2004 Motions Hearing ("Tr.") at 15. The affidavit begins by stating that on

---

1. The Court also concluded that there was no violation of 18 U.S.C. § 3109 and the relevant case law concerning the officers' obligation to knock and announce their identity and purpose before entering the premises to execute a warrant.

July 12, 2003, an individual identified as "Ross" reported that he had been involved in an argument with a Mr. Tyrone Oliver at 7th and G Streets, N.E., and that Mr. Oliver had pointed a black handgun at him. *See* Affidavit in Support of Application for Search Warrant ("Affidavit") at 1. The affidavit states that Ross ran out of the alley and that he observed Mr. Oliver "fleeing east on H Street, NE, in a green vehicle." *Id.* The affidavit then states that Officer Jackson interviewed Ross's mother, who said that Ross and his brother had had an argument with Mr. Oliver the night before (July 11, 2003) and that, according to Ross's mother, Mr. Oliver had said, "You just don't know what these young boys are going to do today." *Id.* There is no indication in the affidavit of when Officer Jackson interviewed Mrs. Ross. Near the bottom of the first page of the affidavit is the handwritten sentence "[t]he CW [Ross] was staying with his mother who lives across the street from Mr. Oliver. The CW's mother also knows Mr. Oliver." *Id.* There is no indication in the affidavit of the source of this information. The initials "C.J." appear next to these handwritten words, and Officer Jackson testified at the suppression hearing that he added those sentences by hand to the typewritten affidavit on August 6, 2003 in the presence of Chief Judge Rufus King of the Superior Court of the District of Columbia. *See* Tr. at 23, 35.

The second page of the affidavit begins with the sentence "CW's mother states the argument was over a female aquaintence [sic] of Mr. Ross' brother" and further states that Ross's "brother was interviewed and stated that on 7–11–03, he had an argument with Mr. Oliver and that a friend of Mr. Ross's brother and Mr. Ross

broke up the dispute because they were about to fight." Affidavit at 2. The affidavit then states that "Mr. Tyrone Oliver's address of record in the MPDC database is 522 F Street N.E. The affiant spoke with CSOSA who confirms Mr. Oliver's address as the same." *Id.*[2]

On the third page of the affidavit, Officer Jackson asserts that based on his experience and conversations with other officers and investigators, "subjects in possession of weapons, normally maintain such items at their residence [sic] the firearm, additional weapons and paraphernelia. Because of the cost associated with the collection of these items, they are usually not disposed of. It is the affiant's belief that secreted inside of 522 F St. N.E., is the firearm used to commit the assault." Affidavit at 3. The affidavit requested a search warrant for "any weapons, ammunition, gun boxes, cleaning kits, papers or any other identifying articles of evidence revelant [sic] to weaponry." *Id.*

At the suppression hearing, Officer Jackson testified that he did not personally interview the complaining witness, "Ross," prior to completing the affidavit. Rather, another officer spoke to Ross on July 12 and reported his conversation with Ross to Officer Jackson. *See* Tr. at 16–17, 24. No one spoke with Ross thereafter because Ross could not be located. *See id.* Thus, the only information about Oliver having had a gun on July 12, 2003 came from Ross, who told the investigating officer who relayed the information to Officer Jackson. Officer Jackson further testified that he got the information about the address at which Mr. Oliver supposedly lived

---

**2.** Officer Jackson clarified at the suppression hearing that CSOSA, the Court Services Offender Supervision Agency, advised that one of its agents did a home visit at 522 F Street,

N.E., sometime prior to July 12, 2003, and that someone at that address said that Mr. Oliver was "staying" there. *See* Tr. at 11, 21–22, 28–29.

from the Metropolitan Police Department database and from the Court Services Offender Supervision Agency three days after the incident, that is, on July 15, 2003. *See* Tr. at 11–14, 24. Finally, he testified that he first spoke with Mrs. Ross about a week and a half later, that is, on or about July 29, 2003. *See id.* at 24, 36. As noted, he applied for the search warrant on August 6, 2003, and it was executed on August 11, 2003. *See id.* at 24–25.

Chief Judge Rufus King of the Superior Court of the District of Columbia reviewed the affidavit and issued a search warrant on August 6, 2003 for "weapons, ammunition, papers, mail matter, gun boxes, and any other evidence relating to weaponry." Superior Court of the District of Columbia Search Warrant; *see also* Tr. at 33–35. On August 11, 2003, while executing the search warrant at 522 F Street, N.E., officers observed the defendant Darius Johnson, in the basement of the residence leaving a bedroom. *See* Tr. at 43–45, 50–51. The police stopped Johnson and searched the room he just had vacated. *See id.* at 43–46. In that room, the police observed an open travel bag that contained a 9–mm Lorcin semi-automatic handgun, a loaded Derringer pistol, and ammunition. *See* Tr. at 38–39, 46–47, 49–50. The officers seized the two handguns, the ammunition and mail matter from the room. *See* Tr. at 50. On September 25, 2003, the defendant was indicted for unlawful possession of a firearm and ammunition by a person previously convicted of a crime punishable by imprisonment of one year or more, in violation of 18 U.S.C. § 922(g)(1).

## II. ANALYSIS

### A. *Leon and the Good Faith Exception*

■ The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause." U.S. Const. amend. IV. The exclusionary rule bars the prosecution from using in its case-in-chief evidence obtained during a search that violated the Fourth Amendment. *See United States v. Dawkins*, 17 F.3d 399, 407–08 (D.C.Cir.1994) (citing *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914)). Under the "good faith" exception to the exclusionary rule, however, that evidence need not be suppressed when police obtain the evidence through objective good faith reliance on a facially valid warrant that later is found to lack probable cause. *See United States v. Leon*, 468 U.S. 897, 920, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The Supreme Court in *Leon* held that a good faith exception to the exclusionary rule was appropriate because when officers engage in objectively reasonable law enforcement activity, suppression would not advance the exclusionary rule's goal of deterring police misconduct. *See id.* at 919–22, 104 S.Ct. 3405; *see also id.* at 922, 104 S.Ct. 3405 ("We conclude that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion.").

■ The Court in *Leon* went on to identify four situations in which it is not appropriate to apply the "good faith" exception because the officer "will have no reasonable grounds for believing that the warrant was properly issued." *United States v. Leon*, 468 U.S. at 923, 104 S.Ct. 3405. Those situations are: (1) where the magistrate issued the warrant based on a deliberately or recklessly false affidavit; (2) where the issuing magistrate failed to act in a neutral and detached manner; (3) where a warrant is based on an affidavit "so lacking in indicia of probable cause as

to render official belief in its existence entirely unreasonable"; and (4) where a warrant is "so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Id.* At issue in this case is the applicability of the third exception to the "good faith" exception. The question is whether Officer Jackson's affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."

#### B. Applicability of the Third Exception

The defendant argues that although *Leon* excuses searches conducted in the absence of probable cause where an officer acts in objectively reasonable reliance on a warrant, *Leon* does not allow a court to "write the Warrant Clause out of the Constitution." Defendant's Motion to Suppress Evidence ("Def.Mot.") at 6. Because the affidavit was "so devoid and so lacking in probable cause 'as to render a belief in its existence entirely unreasonable,'" the good faith exception simply does not apply. *See id.* (quoting *United States v. Leon*, 468 U.S. at 923, 104 S.Ct. 3405, 82 L.Ed.2d 677). Specifically, the defendant argues that Officer Jackson failed to include in the affidavit any effort to corroborate Ross's account, and the absence of any statement by Ross, Ross's brother, or even Ross's mother—whom he interviewed—that Tyrone Oliver actually lived at 522 F Street, N.E., or that he had been seen there recently. The defendant argues further that the affidavit provides no basis to believe that a gun would be found at 522 F Street, N.E., four weeks after Ross allegedly was seen with a gun on the street a few blocks away. He also argues that the evidence of when Oliver lived or "stayed" at that address was so uncertain as to be unreliable and that the lapse of time between both the home visit by CSOSA agents (some

unspecified time before July 12, 2003) or the July 12 incident itself, and the date of the warrant application, August 6, 2003, undermines any basis to believe that either Oliver or his weapon would be found at that address. These failings, defendant argues, are so significant and obvious as to render a reasonable officer's belief that there was probable cause "entirely unreasonable." *United States v. Leon*, 468 U.S. at 923, 104 S.Ct. 3405. There therefore can be no finding that the officers acted in good faith.

■ The Court agrees. The affidavit in the instant case was so deficient that a reasonable officer's belief in the existence of probable cause was unreasonable. The affidavit insufficiently linked the suspect, Tyrone Oliver, with the place to be searched. It failed to state that Mrs. Ross or anyone else actually told the officer that Oliver lived there or had stayed there. It failed to explain why the officers believed they would find Oliver's gun or other evidence incriminating Oliver at that residence nearly four weeks after the July 12 incident and even longer after there was any evidence of Mr. Oliver's connection to the address in question. The "good faith" exception does not apply because "a reasonably well trained officer would have known that the search was illegal despite the [judge's] authorization." *United States v. Hopkins*, 128 F.Supp.2d 1, 9 (D.D.C.2000) (quoting *United States v. Leon*, 468 U.S. at 922 n. 23, 104 S.Ct. 3405).

■ As a threshold matter, the Court notes that it must restrict its inquiry to the four corners of the affidavit. It therefore cannot consider Officer Jackson's later testimony regarding his subjective intentions, knowledge or beliefs. *See United States v. Hove*, 848 F.2d 137, 140 (9th Cir.1988) ("*Leon* does not extend . . . to allow the

consideration of facts known only to an officer and not presented to a magistrate."). Facts learned after the issuance of the warrant or not presented to the judge obviously had no part in Chief Judge King's determination that probable cause existed at the time he issued the warrant, and therefore cannot be used now to justify the warrant or the search. *See id.* Furthermore, if the officer had orally provided more information to Chief Judge King at the time the affidavit was presented, it was incumbent on the officer or the judge to supplement the affidavit in writing so that the affidavit by itself supports the probable cause determination. *See id.* In this case, it is unlikely that there was any more available information than that set forth in the affidavit since what additional information there was already had been added to the affidavit by Officer Jackson in Chief Judge King's presence (and presumably at Chief Judge King's urging or in response to his questions).

On the merits of the government's argument, the case primarily relied upon by the government, *United States v. Gaston,* 357 F.3d 77 (D.C.Cir.2004), is readily distinguishable. Unlike the affidavit in the instant case, the *Gaston* affidavit established a clear link between the defendant and both the residence to be searched and the evidence sought. The *Gaston* affidavit asserted that a reliable informant "within the last 72 hours" reported that the defendant lived at a particular address and that the informant had observed a handgun inside that residence. *See id.* at 79. The court of appeals concluded that it was a "fair reading" of the affidavit that the informant had not only reported his observation of the gun in the residence within the past 72 hours but also actually had observed the gun there during that period of time. *Id.* at 81. Based on the informant's personal observation of a gun inside the residence, the court in *Gaston* then con-

cluded that the "good faith" exception should apply because "if [the defendant] had a gun *in his house* three days before the search, or three weeks before the search, that information would still support probable cause." *Id.* at 81 (emphasis added). Thus, in *Gaston,* a reliable informant actually saw a weapon in the defendant's house three days before the search. Here, an individual, Ross (who may or may not have been reliable), saw a weapon in Oliver's hand several blocks from an address at which Oliver may or may not have lived or stayed at some indeterminate point in the past.

The other cases cited by the government also fail to provide support for the government's position. While the affidavit in *United States v. Webb,* 255 F.3d 890 (D.C.Cir.2001), stated that the last known drug transaction occurred at the residence to be searched more than three months earlier, the court found good faith under *Leon,* because "[c]ourts have been considerably more lenient in assessing the currency of information supporting probable cause in the context of extended [narcotics] conspiracies than in the context of single-incident crimes," and because even if it was unlikely that drugs would still be found in Webb's apartment three months later, "it would not necessarily have been unreasonable" for a long-time drug dealer to still retain customer lists and supplier phone numbers in his apartment. *See id.* at 905, 104 S.Ct. 3405. In this case, by contrast, not only was there no ongoing criminal activity, there was no reliable connection between Oliver and the residence in the first place. Furthermore, as Judge Lamberth said in *Hopkins:*

This [gun] case is distinctly different from the drug trafficking cases where magistrates routinely infer that well-established dealers likely have drugs and related accessories in their homes. Un-

like the drug culture, the incidence of gun possession is not so highly identified with a particular pattern of behavior. While drug dealers usually require a place to store their inventory, gun owners can (and often do) carry their entire artillery—often a single pistol—with them at any one time. People who have a gun rarely need to make repeated purchases of a gun, and rarely run a gun distribution network out of their home. Of course, this could be true in any one case, but the affidavit in the instant case is devoid of any reconnaissance information that would lead one to think such circumstances were afoot.

*United States v. Hopkins,* 128 F.Supp.2d at 7–8.

In *United States v. Salamanca,* 990 F.2d 629, 632 (D.C.Cir.1993), also relied upon by the government, officers investigating an assault on a park police officer recovered a driver's license at the scene of the assault. The court of appeals suggested that the discovery of the defendant's driver's license at the scene, along with the defendant's fingerprints on other items, provided a strong link between the defendant and the assault and between the defendant and the address listed on the license. It was reasonable to conclude that the defendant had carried the license on his person at the time of the assault and (implicitly and obviously) that any holder of a driver's license effectively represents that the address on the license he carries is his *current* address. *See id.* at 634. It therefore was reasonable for the officers to conclude that either the defendant or in-

criminating evidence linking the defendant to the assault would be found at that location.[3]

By contrast, in this case the affidavit provides no evidence of a recent connection between Mr. Oliver and 522 F Street, N.E. and no basis at all to believe that a gun would be found at 522 F Street, N.E. The most that can be said for the affidavit here is that it contains a handwritten statement that Ross "was staying with his mother, who lives across the street from Mr. Oliver," Affidavit at 1, and that two databases confirmed that Mr. Oliver *at one time* listed 522 F Street, N.E. as his address of record. Officer Jackson suggested that Mrs. Ross provided the information he added by hand to the affidavit and testified that an agent of one of those agencies had reported that someone had told that agent more than a month earlier that Mr. Oliver had stayed at that address. Neither of these facts, however, appears in the affidavit. In fact, the affidavit includes no statement as to who, if anyone, told Officer Jackson that Mrs. Ross lived across the street from Oliver and includes no reference to the currency of either the MPDC database listing or the confirmation provided by CSOSA. While Officer Jackson may have suggested at the suppression hearing (his testimony is unclear on this point) that it was Mrs. Ross who told him that Oliver's mother lived across the street from Mrs. Ross and that Mr. Oliver was staying there, the crucial point is that the affidavit itself does not identify Mrs. Ross or anyone else as the source of this information.[4] With no facts as to the currency,

---

**3.** The government's final case, *United States v. Richardson,* 861 F.2d 291 (D.C.Cir.1988), deals primarily with a *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) issue, which concerns whether the affidavit was deliberately false. *Richardson* thus dealt with the first of the *Leon* good faith

exceptions and this case deals only with the third. *Richardson* is irrelevant.

**4.** Officer Jackson testified as follows: "After that we attempted to locate Mr. Ross, and in our efforts in doing so, we learned from his mother and his brother that Mr. Ross after the incident had left his mother's house,

reliability or source of the address information, the officers could not reasonably have believed that the affidavit provided sufficient indicia of probable cause to believe that Mr. Oliver currently resided at 522 F Street, N.E.

Unlike the affidavit in *Gaston*, in which a reliable informant reported actually observing a gun in a residence known to be occupied by the defendant within 72 hours prior to the search, the information included in the affidavit in this case does not provide a recent or reliable link of Mr. Oliver to the residence. While the affidavit through its vagueness and imprecision may suggest on a quick read that Mrs. Ross may have been the source of the information that Mr. Oliver at some point "was staying" at 522 F Street, N.E., there is no actual statement of who the source was or on what he or she based its information, or of when Oliver "stayed" there; at most two databases provided residence information that was at least a month old at the time the officer presented the affidavit to Chief Judge King. No reasonable officer should have acted on this information which fell so far short of probable cause as to make a reasonable officer's belief in its existence "entirely unreasonable." *See United States v. Lalor*, 996 F.2d 1578, 1583 (4th Cir.1993) (where drug sales occurred elsewhere and there was no basis for conclusion that evidence would be stored at defendant's residence, there was insufficient nexus between drug activity and location to be searched); *United States v. Hopkins*, 128 F.Supp.2d at 7 (most obvious shortcoming of affidavit is that it fails to satisfy nexus requirement); *United States v. Huggins*, 733 F.Supp. 445, 449–50 (D.D.C.1990) (affidavit's lack of reference to the time in which a controlled

drug purchase occurred precluded a finding of good faith because "a reasonably well-trained officer would have known that more was needed to establish probable cause").

The Eighth Circuit confronted a similar situation in *United States v. Herron*, 215 F.3d 812 (8th Cir.2000). There it was conceded that the affidavit in support of the search warrant did not establish probable cause, and the court held that there could be no "objective good faith" reliance on the magistrate's determination of probable cause under *Leon* because "[t]here is simply no evidence in either affidavit that [marijuana or the implements of marijuana production] would be found at [Mr. Herron's] residence ...." *Id.* at 814. The court continued:

> Mr. Herron was never seen at the location where the marijuana was discovered, and no marijuana had ever been seen at his residence.... The only evidence concerning the Herron residence was that one time, four months before the search warrant was sought, Buck, Jr., said he was staying there to help harvest corn. We do not think that a reasonable officer would believe that these facts established probable cause to search the Herron residence for marijuana or the implements of its cultivation.

*Id.* Considering the inadequacies of the affidavit, "the lack of probable cause would have been apparent to reasonable officers" and therefore precluded application of the good faith exception. *Id.* at 814–15. The same is true here. *See also United States v. Hove*, 848 F.2d at 139 (affidavit "set forth facts suggesting that [defendant] had sent threatening letters, [but] never linked

---

which is located right across the street from where Mr. Oliver was staying at 522 F Street." Tr. at 11–12. If these were the

facts, they should have been included in the affidavit and the source of the information should have been stated clearly.

[defendant] or any suspected criminal activity in any way with the ... residence").

In sum, the information included in the affidavit in this case so inadequately articulated any *recent* connection between Mr. Oliver and the target address, and so thoroughly failed to provide a basis for believing that his gun would be found at that location four weeks after he had it in his possession on the street a few blocks away, that "any official belief" in the existence of probable cause was "entirely unreasonable." *United States v. Leon,* 468 U.S. at 923, 104 S.Ct. 3405. Because the officers executing the search warrant should have known that the affidavit failed to establish probable cause, they did not manifest objective good faith in relying on the warrant. For this reason, the good faith exception approved by the Supreme Court in *Leon* cannot be applied to save the search or its fruits. Accordingly, the defendant's motion to suppress evidence must be granted.

An Order consistent with this Opinion shall issue this same day.

SO ORDERED.

### ORDER

This matter is before the Court on the defendant's motion to suppress all evidence derived from the August 11, 2003 execution of a search warrant at 522 F Street, N.E., Washington, D.C. Upon consideration of the briefs and supplemental briefs filed by counsel, the testimony presented at the February 3, 2004 motions hearing, and the arguments of counsel, and for the reasons stated at the conclusion of the motions hearing and in the Opinion issued this same day, it is hereby

ORDERED that the defendant's motion to suppress evidence is GRANTED; and it is

FURTHER ORDERED that there shall be a status conference in this case on September 7, 2004 at 1:45 p.m. The government should be prepared to advise the Court how it intends to proceed.

SO ORDERED.